**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EIDO AL-NAHHAS, MARY KEETEN, and JESSICA BUCKLEY, *individually, and on behalf of all similarly situated individuals*, | ) ) ) ) | |
| Plaintiffs, | ) | Case No.: 1:25-cv-00671 |
| vs. | ) ) ) | |
| HUDSON COVE CAPITAL MANAGEMENT, LLC; DAVID WU; FREDERICK WANG; HUDSON COVE CREDIT OPPORTUNITY MASTER FUND, LP; HUDSON COVE CREDIT OPPORTUNITY FUND, LP; HUDSON COVE CREDIT OPPORTUNITY FUND, LTD.; RC ABL FUND LP; HUDSON COVE CREDIT GP, LLC; STEVEN PASKO; JOSHUA WANDER; and JOHN DOES 1-15, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT – CLASS ACTION

Plaintiffs Eido Al-Nahhas ("Plaintiff Al-Nahhas"), Mary Keeten ("Plaintiff Keeten"), and

Jessica Buckley ("Plaintiff Buckley") (collectively, "Plaintiffs"), individually, and on behalf of all

similarly situated individuals, allege as follows:

1.     Plaintiff Al-Nahhas is a party to the case captioned *Al-Nahhas v. 777 Partners, LLC,

et al.*, No. 1:22-cv-00750 (N.D. Ill.) (Tharp, J.), which has been pending before this Court since

February 10, 2022.  In that case, Plaintiff Al-Nahhas sued an entity called Rosebud Lending LZO,

purportedly owned by the Rosebud Sioux Tribe (the "Tribe"), a federally recognized Indian[1] tribe,

as well as two Miami-based companies, 777 Partners, LLC ("777 Partners"), a private equity firm,

---

[1] Throughout this complaint, Plaintiffs use the term "Indian" rather than "Native American," reflecting the fact that tradition, caselaw, and—perhaps most importantly—many indigenous persons themselves follow that practice.

and Tactical Marketing Partners, LLC ("Tactical"), its affiliate, who, with others, created, developed, aided, and abetted a usurious lending scheme called ZocaLoans which offers illegal loans with unconscionable interest rates often exceeding an APR of 700%.[2] The defendants named herein are major participants in the operation of ZocaLoans who could not be identified until recently.

2.      Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*. This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more commonly, as "rent-a-tribe," a "recent incarnation of payday lending regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 753 (2012).

3.      Under this model, non-tribal payday lenders and their business partners use Indian tribes as a vehicle to originate illegal loans on the theory that the loans are subject exclusively to tribal law, and the lender entitled to sovereign immunity as a purported "arm-of-the-tribe," not the protections created by state usury, licensing, and consumer protection laws. But the loans

---

[2] On April 11, 2023, 777 Partners and Tactical moved to compel arbitration. Judge Tharp denied the motion, holding that they waived any purported arbitral rights and, even if they did not, were not entitled to enforce the contracts as non-signatories. *Al-Nahhas v. Rosebud Lending LZO*, No. 22-cv-750, 2023 U.S. Dist. LEXIS 149969 (N.D. Ill. Aug. 25, 2023). 777 Partners and Tactical appealed. *See Al-Nahhas v. 777 Partners, LLC et al.*, No. 23-2723 (7th Cir.). The Seventh Circuit heard oral argument on April 9, 2024, and has taken the appeal under advisement. Judge Tharp stayed the underlying case in its entirety pending the Seventh Circuit resolution of the defendants' appeal. *Al-Nahhas v. Rosebud Lending LZO*, No. 22-cv-750, ECF 132.

nominally made by ZocaLoans are illegal irrespective of any purported tribal sovereign immunity, for sovereign immunity does not—and cannot—transform an otherwise illegal loan into a legal one. Rather, as the Fourth Circuit held in similar litigation: "substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Illinois. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777-79 (7th Cir. 2014). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Hengle*, 19 F.4th at 348.

4. Through the Rosebud litigation, it was determined that additional business partners and investors knowingly aided, funded, facilitated, and participated in the usurious lending scheme complained of herein. Those business partners and investors include, but are not limited to, Hudson Cove Capital Management, LLC, David Wu, Frederick Wang, Hudson Cove Credit Opportunity Master Fund, LP, Hudson Cove Credit Opportunity Fund, LP, Hudson Cove Credit Opportunity Fund, Ltd., RC ABL Fund LP, Hudson Cove Credit GP, LLC[3], Joshua Wander, and Steven Pasko.[4] As a result of this conduct, Plaintiffs complain that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, enacted for the express purpose of "eradicat[ing] organized crime in the United States," including loan sharking. Pub. L. 91– 452, § 1. Together with the defendants in the Rosebud litigation and others, Defendants knowingly maintained an interest in, participated in the operation of, reinvested in, and conspired with other members of the enterprise to profit from usurious loans.

---

[3] Hudson Cove Capital Management, LLC, David Wu, Frederick Wang, Hudson Cove Credit Opportunity Master Fund, LP, Hudson Cove Credit Opportunity Fund, LP, Hudson Cove Credit Opportunity Fund, Ltd., RC ABL Fund LP, and Hudson Cove Credit GP, LLC are sometimes collectively referred to as the "Hudson Cove Entity Defendants."

[4] The Hudson Cove Entity Defendants, Joshua Wander and Steven Pasko are sometimes collectively referred to as "Defendants."

5.      Plaintiffs also assert class claims for unjust enrichment and civil conspiracy. Because the enterprise's loans charged interest rates vastly exceeding what is permitted under the law of Plaintiffs' home states—Illinois, California, and Kentucky—such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. *See* 815 ILCS 123/15-5-10; Cal. Fin. Code § 22750; KRS § 286.4-991. Accordingly, Plaintiffs seek to recover all amounts paid on their and other class members' loans, as well as their costs and attorneys' fees.

6.      Additionally, Plaintiff Al-Nahhas asserts class claims for violations of the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* (the "PLPA") and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the PLPA provides that violations of the PLPA are violations of the Consumer Fraud Act).

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted claims arising under the RICO Act, 18 U.S.C. § 1964. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8.      The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the classes (as defined herein); and the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs.

9.      In addition, the Court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000 and Plaintiff Al-Nahhas is a citizen of Illinois, Plaintiff Keeten is a citizen of Texas, Plaintiff Buckley is a citizen of Kentucky and,

4

upon information and belief, Defendants are citizens of Connecticut, Delaware, Florida, New Jersey, and the Cayman Islands.

10.     This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir. 1992) (finding nationwide service of process in Section 1965(b)), superseded by *Cent. States, Se. & Sw. Areas Pension Fund v. Reiner Express World Corp.*, 230 F.3d 934 (7th Cir. 2000). As a result, personal jurisdiction may be exercised over a defendant anywhere in the United States so long as it does not violate the Fifth Amendment to the Constitution of the United States. *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668 (7th Cir. 1987).

11.     Because Defendants are all residents of the United States and have received millions of dollars from loans made in Illinois, the Court has personal jurisdiction over them under the Fifth Amendment. Further, this Court has personal jurisdiction over each Defendant because they: (1) knowingly participated in the making and collection of unlawful loans to Illinois residents, and (2) helped select which states to offer loans, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Illinois, including in this District and Division. Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in Illinois through their participation in a conspiracy and receipt and collection of millions of dollars from loans made in Illinois, to Illinois residents. In addition, venue is proper in this District and Division under the "ends of justice" because the Court has personal jurisdiction over Defendants and is already familiar with the legal issues and facts raised in this action.

13.     Venue is proper over any defendant not resident to the United States pursuant to 28 U.S.C. § 1391(c)(3).

## PARTIES

14.     Plaintiff Al-Nahhas is a natural person, a resident of Oak Park, Illinois, and a citizen of Illinois.

15.     Plaintiff Keeten is a natural person and a resident and citizen of Texas.

16.     Plaintiff Buckley is a natural person and a resident and citizen of Kentucky.

17.     Defendant Hudson Cove Capital Management, LLC ("Hudson Cove") is a Delaware limited liability company with its principal place of business at Harborside 5, 185 Hudson Street, Suite 1430, Jersey City, New Jersey 07311. Formed in 2009, Hudson Cove is an SEC registered asset manager that provides portfolio management services for pooled investment vehicles. It also invests in various short-term high interest lending companies such as ZocaLoans, the illegal lending operation complained of herein. Hudson Cove has two members, David Wu and Frederick Wang, citizens of New Jersey and Connecticut, respectively.

18.     On its website, Hudson Cove claims that its "investor base is comprised of Sovereign Wealth Funds, US and foreign pensions, endowments & foundations, healthcare plans, family offices, wealth advisory firms, qualified high net worth individuals and investment consultants." (https://hudsoncovecapital.com/about/) (last accessed January 3, 2025).

19.     As explained in detail below, Hudson Cove knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme complained of herein through a multi-million-dollar investment in the lending business that does business as ZocaLoans, a payday lending company that has, since 2015, offered short-term, high-interest loans to financially challenged consumers throughout the United States.

6

20.     As part of this process, David Wu, Frederick Wang, Joshua Wander, and Steve Pasko initiated agreements with the Tribe to craft, develop, and implement the usurious lending scheme at issue in this case, which resulted in the creation of Rosebud Lending LZO. The Hudson Cove Entity Defendants' multi-million-dollar investment and the proceeds stemming therefrom were knowingly used as the capital to make illegal loans to consumers through agreements between 777 Partners and its affiliates, one the one hand, and Rosebud Lending LZO, an entity supposedly owned by the Tribe, on the other.[5] Hudson Cove continued to knowingly aid, facilitate, abet, and profit from the scheme through promissory notes to 777 Partners and/or its affiliates in, on information and belief, an amount exceeding $100 million (discussed in detail below), as well as a series of other interrelated agreements that gave Defendants significant influence and control over the lending operation.

21.     Defendant David Wu ("Wu") is the President, Managing Member, and Chief Financial Officer of Hudson Cove Capital Management, LLC, a firm he founded in 2009 with Fred Wang. As the firm's president, Wu oversees all aspects of its investment and operating activities, including its investment activities with 777 Partners, F3EA Capital, LLC, F3EA Servicing, LLC, F3EA Holdings, LLC, and F3EA Funding, LLC[6], and ZocaLoans. Wu is a citizen of New Jersey, and, upon information and belief, maintains his permanent residence at 107 Woodfield Drive, Short Hills, New Jersey 07078.

---

[5] Rosebud Lending LZO claims to be owned by an entity called Rosebud Lending, an entity purportedly owned by the Rosebud Economic Development Corporation ("REDCO"), which claims to be owned by the Tribe. In any event, the principal beneficiaries of ZocaLoans are those defendants named herein.

[6] F3EA Capital, LLC ("F3EA Capital"), F3EA Servicing, LLC ("F3EA Servicing"), F3EA Holdings, LLC ("F3EA Holdings"), and F3EA Funding, LLC ("F3EA Funding") are sometimes collectively referred to as the "F3EA Entities."

22.     Upon information and belief, Wu was intimately involved in the Hudson Cove Entity Defendants' decision to invest in ZocaLoans, knowing that those funds would be used to support its usurious lending activities. Further, Wu knowingly maintained the Hudson Cove Entity Defendants' investment despite his knowledge that it aided, abetted, and supported the usurious lending scheme. Upon information and belief, at all times relevant hereto, Wu received updates from Joshua Wander, Steven Pasko, 777 Partners, the F3EA Entities as well as ZocaLoans related to the Hudson Cove Entity Defendants' investment, distributions, and litigation surrounding the illegality of the lending product. Wu was also involved and participated in the design of the initial structure of the scheme.

23.     Defendant Frederick Wang ("Wang") is co-founder, member, and Portfolio Manager of Hudson Cove and manages and maintains an interest in several different entities that invested in ZocaLoans, including, on information and belief, Hudson Cove Capital Management, LLC, Hudson Cove Credit GP, LLC, Hudson Cove Credit Opportunity Fund, LP, Hudson Cove Credit Opportunity Master Fund, LP, Hudson Cove Credit Opportunity Fund, Ltd., and RC ABL Fund LP. Wang is a citizen of Connecticut, and, upon information and belief, maintains his permanent residence at 194 Bedford Road, Greenwich, Connecticut 06831.

24.     As explained in more detail below, Wang knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through substantial investments in 777 Partners and its affiliates and ZocaLoans. Wang's investment was knowingly used as the capital to make the illegal loans to consumers through agreements between 777 Partners and its affiliates and Rosebud Lending LZO, the nominal lender. Wang and his investment companies knowingly continued to aid, facilitate, and profit from the scheme through promissory notes to 777 Partners and/or its affiliates as well as a series of other interrelated agreements that gave the Hudson Cove

Entity Defendants and 777 Partners and its affiliates (and its closely held investors) significant input and control over the lending operation. Wang was also involved and participated in the design of the initial structure of the scheme.

25.     Defendant Hudson Cove Credit Opportunity Fund, LP is a Delaware limited partnership with its principal place of business at Harborside 5, 185 Hudson Street, Suite 1430, Jersey City, New Jersey 07311. On information and belief, Hudson Cove Credit Opportunity Fund, LP is managed by Hudson Cove, who is its sole partner. As noted above, Hudson Cove is a citizen of Connecticut and New Jersey. On information and belief, Hudson Cove Credit Opportunity Fund, LP has invested in the ZocaLoans enterprise and has received wires comprised of interest payments made by consumers on loans made by ZocaLoans. Hudson Cove Credit Opportunity Fund, LP has reinvested those monies back into the ZocaLoans enterprise.

26.     Defendant Hudson Cove Credit GP, LLC is a Delaware limited liability company with its principal place of business at Harborside 5, 185 Hudson Street, Suite 1430, Jersey City, New Jersey 07311. Hudson Cove Credit GP, LLC's members are Wu and Wang, citizens of New Jersey and Connecticut, respectively. On information and belief, Hudson Cove Credit GP, LLC has invested in the ZocaLoans enterprise and has received wires comprised of interest payments made by consumers on loans made by ZocaLoans. On information and belief, Hudson Cove Credit GP, LLC has reinvested those monies back into the ZocaLoans enterprise.

27.     Defendant Hudson Cove Credit Opportunity Master Fund, LP is a limited partnership registered in the Cayman Islands with its principal place of business at Harborside Financial Center 5, 185 Hudson Street, Suite 1430, Jersey City, New Jersey 07311. Hudson Cove Credit Opportunity Master Fund, LP lends money to small and medium-sized private companies and is managed by Hudson Cove. Hudson Cove Credit Opportunity Master Fund, LP is a citizen

of Connecticut and New Jersey as its sole partner is Hudson Cove Credit GP, LLC whose members are Wu and Wang, citizens of New Jersey and Connecticut, respectively. Hudson Cove Credit Opportunity Master Fund, LP has invested in the ZocaLoans enterprise and has received wires comprised of interest payments made by consumers on loans made by ZocaLoans. On information and belief, Hudson Cove Credit Opportunity Master Fund, LP has reinvested those monies back into the ZocaLoans enterprise.

28.     Defendant Hudson Cove Credit Opportunity Fund, Ltd. is a Cayman Islands registered corporation managed by Hudson Cove that lends money to small and medium-sized private companies. Hudson Cove Credit Opportunity Fund, Ltd.'s principal place of business is Harborside Financial Center 5, 185 Hudson Street, Suite 1430, Jersey City, New Jersey 07311. On information and belief, Hudson Cove Credit GP, LLC is the sole partner of Hudson Cove Credit Opportunity Fund, Ltd. On information and belief, Hudson Cove Credit Opportunity Fund, Ltd. has invested in the ZocaLoans enterprise and has received wires comprised of interest payments made by consumers on loans made by ZocaLoans. On information and belief, Hudson Cove Credit Opportunity Fund, Ltd. has reinvested those monies back into the ZocaLoans enterprise.

29.     Defendant RC ABL Fund LP is a Delaware limited partnership with its principal place of business at Harborside 5, 185 Hudson Street, Suite 1430, Jersey City, New Jersey 07311. On information and belief, RC ABL Fund LP is managed by Hudson Cove Credit GP, LLC, who is its sole partner. As noted above, Hudson Cove Credit GP, LLC is a citizen of Connecticut and New Jersey. On information and belief, RC ABL Fund LP has invested in the ZocaLoans enterprise and has received wires comprised of interest payments made by consumers on loans made by ZocaLoans. On information and belief, RC ABL Fund LP has reinvested those monies back into the ZocaLoans enterprise.

30.     Defendant Joshua Wander ("Wander") is co-founder and Managing Partner of 777 Partners, LLC. Wander—together with Steven Pasko and Mollie Wander (Wander's sister)— controls and manages the entities who provide services to ZocaLoans. On information and belief, Wander has invested his own money in the illegal enterprise doing business as ZocaLoans. Wander is a citizen of Florida, and, upon information and belief, maintains his permanent residence at 1300 Monad Terrace, Penthouse B, Miami Beach, Florida 33139.

31.     Wander personally participated in and oversaw the decision to enter into a partnership with the Tribe to fund and profit from its usurious lending scheme. Because Wander was personally involved in the initiation, development, management, oversight, and facilitation of the partnership, he is personally liable to consumers. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at *11 (C.D. Cal. Jan. 19, 2018) (finding a lending business owner liable for a $10.2 million-dollar judgment because "he directly participated in and had the ability to control" the deceptive acts).

32.     Defendant Steven Pasko ("Pasko") is the other co-founder and Managing Partner of 777 Partners. Pasko—together with Joshua Wander—controls and manages many of the entities who provide services to ZocaLoans. On information and belief, he has personally invested in the illegal enterprise doing business as ZocaLoans. Pasko is a citizen of Floridia and, upon information and belief, lives at 1451 Brickell Avenue, Penthouse 54, Miami Beach, Florida 33131.

33.     Pasko personally participated in and oversaw the decision to enter into a partnership with the Tribe to fund and profit from its usurious lending scheme. Because Pasko was personally involved in the initiation, development, management, oversight, and facilitation of the partnership, he is personally liable to consumers. *Consumer Fin. Prot. Bureau*, 2018 WL 485963, at *11.

34.     John Does 1-15 are other natural and artificial persons involved in the illegal lending, investment, and collection activities described herein. Such persons include entities who invested in ZocaLoans via certain of the funds named as defendants herein.

## FACTUAL BACKGROUND

### A.     State usury and licensing laws are designed to protect consumers from usurious loans.

35.     "From times immemorial, governments have sought to protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (cleaned up). The United States is no exception. Indeed, "[a]s a nation, America has historically been deeply committed to usury law." Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

36.     That commitment "grew directly out of shared public consciousness and acceptance" of moral traditions and laws like the English Statute of Anne, "which capped interest rates with a simple nominal annual rate of 5%." *Id*. (citing *Act to Reduce the Rate of Interest*, 1713, s Ann., c. 16 (Eng.)). "The first American usury law, adopted by the Massachusetts colony in 1641, pre-dates the U.S. Constitution by nearly 150 years." *Id*. at 1117. That law limited interest rates to no more than 8% per annum. *Id*.

37.     While the states were divided on many issues, usury was not among them. Each of the original states "adopted usury laws capping interest rates" between 5% and 8%. *Id*.

38.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these

requirements, including Illinois, California, and Kentucky, *i.e.*, Plaintiffs' home states where they applied for, received, and repaid their loans.

**1.      Illinois**

39.      In Illinois, it is unlawful for anyone who does not have a bank or credit union charter, or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

40.      Any loan made by an unlicensed person to an Illinois resident at an interest rate exceeding 9% is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

41.      Any loan made by an unlicensed person to an Illinois resident at an interest rate exceeding 9% violates the Interest Act, 815 ILCS 205/4, and subject to statutory damages under 815 ILCS 205/6.

42.      Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). The statute applies to a person who "while either within or outside the State, by his own conduct

or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State[.]" 720 ILCS 5/1-5.

43. Contracts made in violation of the licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice-of-law clauses nor other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

44. The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g.*, *In the Matter of Red Leaf Ventures, LLC*, No. 12 CC 569; *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

## a. The Predatory Loan Prevention Act

45. Effective March 23, 2021, the Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq*. "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

14

46.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of the [PLPA], including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

47.     By, among other things, making or arranging the loans complained of herein, Defendants violated the Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq*.

48.     The PLPA provides that it "applies to any person or entity that offers or makes a loan to a consumer in Illinois" (815 ILCS 123/15-1-15(a)) as well as "to any person or entity that seeks to evade its applicability by any device, subterfuge, or pretense whatsoever." 815 ILCS 123/15-1-15(b).

49.     The PLPA specifically covers loans made to Illinois residents over the internet. 815 ILCS 123/15-1-10 defines "loan" to include "closed-end and open-end credit, retail installment sales contracts, motor vehicle retail installment sales contracts, and any transaction conducted via any medium whatsoever, including, but not limited to, paper, facsimile, Internet, or telephone."

50.     815 ILCS 123/15-5-15, "no evasion," provides:

(a)     No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to, making loans disguised as a personal property sale and leaseback transaction; disguising loan proceeds as a cash rebate for the pretextual installment sale of goods or services; or making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate or interest, consideration, or charge than is permitted by this Act through any method including mail, telephone, internet, or any electronic means regardless of whether the person or entity has a physical location in the State.

(b)     If a loan exceeds the rate permitted by Section 15-5-5, a person or entity is a lender subject to the requirements of this Act notwithstanding the fact that the person or entity purports to act as an agent, service provider, or in another capacity for another entity that is exempt from this Act, if, among other things:

(1)     the person or entity holds, acquires, or maintains, directly or indirectly, the predominant economic interest in the loan; or

(2)     the person or entity markets, brokers, arranges, or facilitates the loan and holds the right, requirement, or first right of refusal to purchase loans, receivables, or interests in the loans; or

(3)     the totality of the circumstances indicate that the person or entity is the lender and the transaction is structured to evade the requirements of this Act. Circumstances that weigh in favor of a person or entity being a lender include, without limitation, where the person or entity:

(i)     indemnifies, insures, or protects an exempt person or entity for any costs or risks related to the loan;

(ii)    predominantly designs, controls, or operates the loan program; or

(iii)   purports to act as an agent, service provider, or in another capacity for an exempt entity while acting directly as a lender in other states.

51.     Waiver of the PLPA is expressly forbidden. 815 ILCS 123/15-10-25 ("[t]here shall be no waiver of any provision of this Act."). The inclusion of "a nonwaiver provision is indicative of the Illinois legislature's intent to establish public policy." *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 806 (N.D. Ill. 2024) (citations omitted).

52.     Any purported waiver of the PLPA is unconscionable and violative of a fundamental public policy of Illinois. *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734, 743 (N.D. Ill. 2023).

### 2.     California

53.     "Usury—the charging of excessive interest rates—is an ancient practice dating back to the earliest commercial civilizations."[7] Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

---

[7] Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012).

54. California—founded in 1850—has regulated interest rates since 1872. *See id*. at 1385.

55. The law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

56. Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

57. "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id*.

58. California's usury laws are primarily designed to penalize those who take advantage of "unwary and necessitous borrowers," *Del Mar v. Caspe*, 222 Cal. App. 3d 1316, 1326 (Cal. Ct. App. 1990), and its consumer and borrower protections support a robust and longstanding public policy against the types of unconscionable and usurious loans funded by Defendants. The California statutory scheme is "liberally construed and applied to promote its underlying purposes and policies" including "to protect borrowers against unfair practices by some lenders," and "encourage the development of fair and economically sound lending practices." Cal. Fin. Code § 22001(a).

59.     If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation shall directly or indirectly take or receive in money, goods, or things" and the loan is void. Cal. Civ. Code § 1916-2.

60.     Cal. Const. Art. XV § 1 reflects an important public policy of the State of California. California's prohibition on usury is enshrined in its constitution and the laws prohibiting usurious loans and granting recourse to those who have been wronged by such loans are created by statute and cannot be waived. A public policy that cannot be waived is fundamental.

61.     In addition to their violation of California's general usury law, the loans at issue in this case violated California's financing laws because they were made without a license and imposed interest rates far greater than those permitted by California law. None of the Defendants has ever had a lending license from the California Department of Financial Protection and Innovation ("DFPI").

62.     As a result, California law renders the entire contract "void," including the "right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750.

63.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**3.      Kentucky**

64.     Kentucky's general interest and usury statute provides a default legal interest rate but also caps the upward deviation that parties may agree to in writing. For contracts where the original principal amount is $15,000 dollars or less, KRS § 360.010 provides the following:

The legal rate of interest is eight percent (8%) per annum, but any party or parties may agree, in writing, for the payment of interest in excess of that rate as follows: (a) at a per

18

annum rate not to exceed four percent (4%) in excess of the discount rate on ninety (90) day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the transaction is consummated or nineteen percent (19%), whichever is less . . . .

*Id*.

65. KRS § 286.4-420 provides that no person shall "engage in the business of making loans in the amount or of the value of fifteen thousand dollars ($15,000) or less at a greater rate of interest, or consideration therefor than otherwise permitted by law" without first obtaining a license form the Kentucky Department of Financial Institutions.

66. And "[a]ny loan contract made in violation of [the foregoing requirement] shall be void and the lender shall have no right to collect any principal, charges or recompense whatsoever." KRS § 286.4-991.

67. Kentucky's usury statute "is one of general applicability, designed to protect consumers from usurious rates in consumer contracts." *Grace v. LVNV Funding, Inc.*, 22 F. Supp. 3d 700, 702-03 (W.D. Ky. 2014).

**B.      Overview regarding the creation of the tribal lending business model.**

68. As discussed above, usury laws "to cap interest rates on loans predate[] the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

69. Unfortunately, despite state and some very limited federal protections designed to prevent usurious lending, "predatory financial services are heavily marketed to financially vulnerable consumers."[8] The collection of unlawful and usurious loans continues to be a major

---

[8] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-paydaydebttraps/. Predatory financial services, including high-cost installment loans and payday debt traps, often

problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

70.     Over the past several decades, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

71.     And it is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

72.     Prior to the "rent-a-tribe" business model, some payday lenders entered into partnerships with banks to avoid compliance with state laws.[9] Such partnerships are commonly known as "rent-a-bank" schemes, as the bank participates only by lending its name and charter to the transaction.[10]

---

involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[9] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp., Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17–22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

[10] *See Pennsylvania v. Think Finance, Inc.*, No. 14-7139, 2016 WL 183289, at *1 (E.D. Pa. 2016) (describing rent-a-bank scheme, where a payday lender partners with "an out-of-state bank" to act "as the nominal lender while the non-bank entity [is] the de facto lender" in a partnership that seeks to take "advantage of federal bank preemption doctrines to insulate the [payday lending entities] from state regulation").

73.     Others attempted to evade state usury and consumer protection laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

74.     In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Indian tribes in an attempt to avoid state laws. Martin & Schwartz, *supra* at 759.

75.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, formerly of Katten Muchin Rosenman LLP, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

76.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm-of-the-tribe lending or tribal member lending. *Id.*

77.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

78.     Calloway was wrong. State usury and consumer protection laws apply to loans made to consumers—like Plaintiffs and members of the putative classes—over the Internet by unlicensed, out of state lending operations—like ZocaLoans—that are operated by, and for the benefit of, non-tribal persons, off the reservation.

79.     Callaway is one of several attorneys who represented payday lenders in these transactions with tribes; another is Jennifer Weddle of Greenberg Traurig.

80.     On the other side of the table was the late Robert Rosette and representatives of his law firm, Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on December 27, 2024).

81.     Rosette was a well-known attorney who represented tribes willing to engage in the tribal business model.

82.     On information and belief, Rosette represented the Tribe and introduced 777 Partners, Wander, and Pasko to the Tribe in 2015 for the purpose of setting up the ZocaLoans operation complained of herein.

83.     Eric Lochen—an attorney in Minnesota with ties to various tribal lending schemes—together with representatives of his law firm, Lochen Law Offices PLLC, and an attorney named Shane Thin Elk ("Thin Elk") were also involved in the scheme complained of herein.[11]

84.     Lochen signed the lending license created by Defendants that purports to authorize ZocaLoans to make illegal loans out of Florida. On information and belief, Lochen is not a member of the Tribe, nor any other federally recognized Indian tribe.

85.     Rosette, Lochen, and Think Elk shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe receives only a nominal amount of the proceeds from the loans.

---

[11] Thin Elk formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "Protecting Tribal Sovereignty," and Lochen Law Offices, PLLC, where he conducted seminars on "partnering with non-Tribal entities for commercial enterprises." He is now the owner of Thin Elk Law in Green Bay, Wisconsin.

86.     "Courts across the country have confronted" these "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *Gingras v. Think Fin., Inc.,* 922 F.3d 112, 126 (2d Cir. 2019). A key component of these schemes involves crafting arbitration contracts "in which borrowers are forced to disclaim the application of federal and state law in favor of tribal law," which is often "exceedingly favorable to the tribal lending entity" and which permit no recourse against its business partners. *Id.* at 126-27.

87.     Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *See*, *e.g.*, *Fahy v. Minto Dev. Corp.*, No. 23 C 3590, 2024 U.S. Dist. LEXIS 45147 (N.D. Ill. Mar. 14, 2024); *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734 (N.D. Ill. 2023).[12]

88.     Like the prior schemes, the tribal lending model is highly problematic. Most notably, the loans are aggressively marketed, funded, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

89.     There have been numerous class actions lawsuits and government enforcement actions that have returned hundreds of millions of dollars to consumers who were victimized by

---

[12] *See also*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348, 793 S.E.2d 357, 366 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin., LLC*, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

illegal tribal lending enterprises. *See generally Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, ECF 141 (E.D. Va. Dec. 13, 2019) (order granting final approval of the class settlement).

90.     Two prominent perpetrators were convicted and sentenced to prison for their roles.[13]

91.     Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed herein.

92.     Defendants are not, and have never claimed to be, employees, directors, officers, governors, managers, members, parent companies, or affiliates of the Tribe or Rosebud Lending LZO, and no principle-agent relationship exists between Rosebud Lending LZO and Defendants or between the Tribe and Defendants.

**C.     Overview of 777 Partners and the F3EA Entities.**

93.     Headquartered in Miami, Floridia, 777 Partners is a private investment firm nominally focused on a range of investments in the insurance, aviation, sports, and media sectors— it is now seemingly in financial distress. *See*, *generally*, *Leadenhall Capital Partners LLP v. Wander*, No. 1:24-cv-03453 (S.D.N.Y.).

94.     777 Partners was founded by Joshua Wander, who is its Managing Partner. In addition to 777 Partners, Wander controls and manages the F3EA Entities which were responsible for, among other things, marketing, servicing, funding, and collecting loans nominally made by ZocaLoans.

---

[13] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guiltyracketeering-conspiracy-payday-lending-case.

95.     Steven Pasko is the other co-founder and Managing Partner of 777 Partners, and, upon information and belief, he controls the F3EA Entities alongside Wander.

96.     Wander, through his trade name 777 Partners and its subsidiaries and affiliates, invests in, among other things, various forms of "receivables." Those receivables include future cash flows from so-called "structured settlements," lottery winnings, and predatory loans.

97.     Relevant to this action, in early 2015, 777 Partners, Pasko, and Wander decided to branch out into the world of high interest consumers loans using the "tribal lending" model.

98.     To that end, 777 Partners, Wander, and Pasko formed the F3EA Entities for the express purpose of running the ZocaLoans enterprise. Among other things, the F3EA Entities: (1) organized the funding of loans nominally made by ZocaLoans; (2) managed and serviced the loans; (3) operated a call center for customer support and processing of the loans; and (4) marketed the loans.

99.     In other words, through the F3EA Entities, 777 Partners, Wander and Pasko provided a turnkey lending operation, and in exchange, the Tribe created a tribal entity, Rosebud Lending LZO, to serve as the conduit for the loans.

100.    In exchange for use of the Tribe's economic development corporation's name, Defendants, together with Wander and Pasko and the companies they dominate, offered to provide capital to fund loans made by ZocaLoans and provide the resources necessary to operate all aspects of an online lending operation.

101.    The F3EA Entities were also often the vehicles through which the Hudson Cove Entity Defendants, Wander, and Pasko received substantial sums of money generated from the making and collection of the usurious loans.

102.    On or around October 19, 2015, ZocaLoans was established, and consumers were able to obtain a loan from the ZocaLoans website as early as November 2015.

103.    777 Partners, Wander, and Pasko have ties to other high interest payday lenders and have employed numerous individuals with experience in running illegal lending models like the one complained of herein. For example, Edward Gehres, the former General Counsel of 777 Partners, worked at Think Finance, a short term, high-interest payday lender. *See* (Exhibit A) ("Mr. Gehres also recently served as outside General Counsel to Think Finance"). Matthew Ghourdjian, 777 Partners' Chief Digital Officer, previously served as Chief Information Officer for the high-interest lender CashCall. (Exhibit B) (Mr. Ghourdjian served "as the CIO of DiTech.com and CashCall."). 777 Partners' Hussein Sleiman also worked at CashCall. (Exhibit C) ("Mr. Sleiman was the lead technical architect and manager on the development of the CashCall and LoanMe cloud native lending and servicing platforms.").

104.    According to its website www.zocaloans.com, ZocaLoans provides short-term loans of "up to $1,500," and provided borrowers with an "instant decision."

105.    On its homepage, the ZocaLoans website stated that "Rosebud Lending LZO is the tribal lending agency of Rosebud Lending, a subsidiary of the Rosebud Economic Development Corporation, an economic development arm and entity of the Rosebud Sioux Tribe, a sovereign nation located within the United States of America and operating within the Tribe's reservation. Rosebud Lending does business as ZocaLoans." *Id*.

106.    Consistent with this representation, the ZocaLoans website and loan agreements claimed that the lending business operated from 27565 Research Park Dr. Mission, South Dakota 57555.

107. The ZocaLoans website also claimed that "[t]he laws of the Rosebud Sioux Tribe ("Tribal Law") govern …without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal Law, and in the event of a bona fide dispute between you and us, Tribal Law shall exclusively apply to such dispute." *Id*.

**D.      Rosebud Lending LZO is a front for the Hudson Cove Entity Defendants, Pasko, Wander, and 777 Partners' usurious lending activities.**

108. Although Rosebud Lending LZO d/b/a ZocaLoans claims to be "wholly owned and operated" by the Tribe within its reservation, the Tribe's role was a front—beginning in 2015 and continuing through at least the end of 2023, 777 Partners and the F3EA Entities—at the direction of Pasko, Wander, and the Hudson Cove Entity Defendants—handled every material aspect of the lending activities.

109. The purported "tribal" lending entity is a facade for the illegal lending scheme. All substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the Tribe.

110. Additionally, nearly all revenue went to non-tribal outsiders, such as 777 Partners, Wander, Pasko, and the Hudson Cove Entity Defendants.[14]

111. Employees of 777 Partners and F3EA Entities—located at 1855 Griffin Road Dania Beach, Florida 33004 and 600 Brickell Avenue, 19th Floor, Miami, Florida 33131—handled the

---

[14] *See*, *e.g.*, the Rosebud Economic Development Corporation's ("REDCO") Annual Report for 2019 (showing Rosebud Lending with $51 million in assets, but REDCO only receiving $3 million in revenues, and "management fee" of over $30 million paid out to non-tribal entities); REDCO Annual Report for 2018 (stating Rosebud Lending had operating revenue of only $1.8 million, and showing a $936,933 "Management Fee" paid out to non-Tribal entities); *see also* 2021.06.15 public Facebook Post by Lynne Colombe ("We haven't seen any revenue from REDCO since 2019 (less than $300k)" "I'm tired of learning more about our 'Tribal business' from Google").

day-to-day operations of ZocaLoans, including underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management.

112. To that end, F3EA Servicing entered into Master Servicing Agreements with Rosebud Lending LZO whereby it agreed to provide: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from ZocaLoans borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information to determine whether to fund loans and credit such potential customers' accounts with the appropriate amounts for debits and credits.

113. Domain registration records from 2019 reflect that www.zocaloans.com is registered to 777 Partners. (Exhibit D). The Zocaloans.com website also stated that all copyrights and trademarks are owned by SkyFinancial, F3EA Funding's trade name.

114. 777 Partners' own website states that F3EA Servicing "provides origination, servicing, compliance and underwriting capabilities to various loan and leasing portfolios. F3EA supports client growth through its end to end servicing infrastructure[.]" (www.777part.com/fintech/f3ea-servicing) (last visited on December 27, 2024).

115. Mollie Wander is a member of F3EA Servicing and claims to be the General Counsel of F3EA Funding. (See www.skyfinanical.com) (last visited on December 27, 2024). She is intimately involved in the operation of ZocaLoans and participated in negotiating the contracts "awarded" to the F3EA Entities.

116. Marie Gizzi, an employee of F3EA Servicing, stated on her LinkedIn Profile that she works for "Zocaloans subsidiary of F3EA Servicing LLC." (Exhibit E). And that, in her capacity as a loan processor, she "[r]eview[s] and analy[zes] loan applications, credit bureau

reports, bank statements and financial documentation to ensure all loan documentation is complete, accurate and verified before submitting to underwriting." *Id.*

117.    Vanessa Ponce, an employee of F3EA Servicing, claims to be a "Customer Service Supervisor at Zoca Loans." (Exhibit F).

118.    The LinkedIn profile of Jennifer Menard, a "Senior Operations Analyst" at 777 Partners, states that "[p]rior to joining 777" Menard "was employed by F3EA Holdings in April 2016, with the ZocaLoans portfolio as payment processor[.]" (Exhibit G).

119.    Pasko signed various security agreements between F3EA Capital, LLC, and Rosebud Lending LZO. Pasko also executed various marketing agreements between F3EA Servicing, LLC and Rosebud Lending LZO. On information and belief, Mollie Wander was involved in the negotiation of each of these agreements. Edward Gehres also signed agreements between the F3EA Entities and Rosebud Lending LZO.

120.    All material policies and procedures relating to the lending operation were instituted by Defendants, Wander, and Pasko and entities they dominate without input from the Tribe, REDCO, Rosebud Lending, or Rosebud Lending LZO.

**E.    Allegations regarding the Hudson Cove Entity Defendants, including their knowledge and facilitation of the usurious lending scheme.**

121.    Having created the F3EA Entities for the purpose of running the ZocaLoans lending operation, Pasko, Wander, and 777 Partners needed significant capital to originate the loans in the first instance. Indeed, the capital buttressing a lending operation proves at least as essential to that operation as the day-to-day managers who direct the issuing and collection of loans. Capital is the *sine qua non*; without access to liquid funds, a lender is no lender at all.

122.    While 777 Partners claims to manage $13 billion of its own employee's money, on information and belief, the claim is false. It does not—and has never had—the monies necessary to fund the ZocaLoans enterprise on its own.

123.    Therefore, on information and belief, in March 2015, 777 Partners, Pasko, and Wander turned to the Hudson Cove Entity Defendants and solicited their investment in ZocaLoans for the express purpose of funding the loans made by ZocaLoans and financing the activities of the F3EA Entities.

124.    A detailed below, the Hudson Cove Entity Defendants agreed to fund the loans made by ZocaLoans and finance the lending enterprise.

125.    Although Wander, Pasko, 777 Partners and the F3EA Entities were the architects of the scheme, the Hudson Cove Entity Defendants and their management teams knowingly aided, abetted, and facilitated the scheme—primarily by providing: (1) substantial capital to fund the loans to consumers; (2) their input, influence, and consent on decisions relating to the portfolios; and (3) rolling over profits in the scheme for reinvest and growth of the investment.

126.    More specifically, with full knowledge that it would be used to facilitate the high-interest loans, Defendants invested, on information and belief, $100 million in ZocaLoans to be used in connection with its usurious lending scheme. In exchange, the Hudson Cove Entity Defendants received, on information and belief, a fixed return on the invested funds, as well as fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers, including Plaintiffs.

127.    The Hudson Cove Entity Defendants are important players in the world of high interest lending. For example, in 2023 and 2024, Fred Wang was a featured speaker at LEND360 (https://www.lend360.org/2023-speakers-2/) an annual summit for "leaders" in online lending,

which "focus[es] on the unique needs of online lending providers." (https://www.lend360.org/about-lend360/) (last accessed January 20, 2025).

128.    At the 2024 conference, Fred Wang shared the stage with Eric Johnson, the Chief Revenue Officer of Carmel Solutions, an Indiana-based company that processed ACH debits and credits for ZocaLoans from 2015 to 2016.

129.    In 2020, Wang travelled to Jacksonville for a similar conference called Lend Connect where he spoke on a panel discussing "Raising Capital For Your Lending Programs."

130.    Wang seemingly knows what he's talking about: the Hudson Cove Entity Defendants have funded numerous payday lending operations in the United States and Canada. They have also invested in numerous "tribal" lending enterprises in addition to ZocaLoans.

131.    For example, in July 2021, the Hudson Cove Entity Defendants participated in extending a $84 million credit facility to Idea Financial. (*See* https://www.ideafinancial.com/blog/idea-financial-closes-84-million-warehouse-facility;https://debanked.com/2023/02/idea-financial-upsizes-its-credit      facility-to-112m/). Sometime in February 2023, Hudson Cove upsized that credit facility to $112 million. *Id*.

132.    Wu and Wang are actively involved in decisions concerning making such facilities, and were actively involved in the decision to invest in ZocaLoans. For example, with respect to the Idea facility, Wang is quoted as saying, "[w]e've gotten a very good feel for them as a management team." (*See* https://debanked.com/2023/02/idea-financial-upsizes-its-credit-facility-to-112m/).

133.    In November 2021, FinTech Finance News reported that Hudson Cove contributed $10 million to a credit facility for a financial technology company called Kafene, which operates a platform for consumers to finance small purchases at high interest rates. (*See*

https://www.abladvisor.com/deal-tables/deal/5943/credit-suisse-hudson-cove-capital-provide-60mm-financing-to-fintech-kafene). With respect to Kafene, Hudson Cove's Wang is quoted to have said, "[w]e see strong upside for Kafene's business and have confidence in the team to execute its vision." *Id.*

134.    In December 2022, Hudson Cove extended a credit facility of $150 million to OppFi Inc., the public parent of Opportunity Financial, LLC, a financial technology company that markets and provides predatory, high-interest, short-term loans to consumers. (*See* https://www.businesswire.com/news/home/20221220005247/en/OppFi-Closes-150-Million-Credit-Facility). Per OppFi's CEO, Todd Schwartz, the facility "enable[d] [OppFi] to finance receivables growth, furthering our mission to facilitate credit access to the 60 million Americans[.]" *Id.*

135.    Like ZocaLoans, OppFi entices vulnerable consumers with the prospect of fast cash only to trap them in a cycle of debt through its predatory, high-cost loans.

136.    In order to make these loans, OppFi associates with banks like Capital Community Bank that claim to be entitled to make loans under the laws of the state in which they are chartered, in the case of Capital Community Bank, Utah, which has no interest rate limit, while entities like OppFi are subject to state laws limiting high interest loans.[15]

137.    OppFi is defending several lawsuits alleging that it is the true lender of loans nominally made by its bank partners as it has the predominant economic interest in the loans, bears the risk of poor loan performance, and funds the expenses for the provision of the loans. It has also

---

[15] *See Rent-A-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protections.* Consumer Federation of America and the U.S. Public Interest Research Group, Washington, DC, Nov. 13, 2001, available at https://uspirg.org/reports/usp/rent-bank-payday-lending (describing the then emerging trend of "rent-a-bank" schemes among payday lenders).).

been sued by the Office of the Attorney General of the District of Columbia, resulting in a settlement whereby OppFi agreed to "pay $1.5 million to refund over 4,000 District consumers who were charged exploitive interest rates by the company, waive over $640,000 in interest owed by those consumers, and pay $250,000 to the District." (*See* https://oag.dc.gov/release/ag-racine-announces-over-2-million-settlement). The California Department of Financial Protection and Innovation has also brought similar ligation against OppFi contending that it is the "true lender," and therefore subject to usury limits, unlike a state-chartered bank.

138.    Hudson Cove has also invested in a Canadian company called Propel Holdings (doing business as Fora Credit, CreditFresh, and MoneyKey) that makes loans to consumers at triple digit interest rates. (*See* https://www.prnewswire.com/news-releases/pathlight-joins-330-000-000-credit-facility-for-propel-holdings-302307360.html). In July 2024, the credit facility available to these entities was reported to have a commitment of $320 million. *Id.*

139.    Hudson Cove has also extended a $9 million credit facility to a company called National Funding which makes high interest loans to small businesses. (*See* https://www.prnewswire.com/news-releases/national-funding-secures-warehouse-funding-from-forbright-bank-302284225.html).

140.    Unlike the investments noted above, the Hudson Cove Entity Defendants' investment in ZocaLoans was kept secret—there were no press releases or statements by Wu or Wang. And for good reason:  Defendants investment was used to make loans that are illegal under the laws of most states—and the collection of which violates federal law—and to fund an illegal lending operation. Defendants therefore worked tirelessly to conceal their investment and involvement in ZocaLoans.

141.    Accordingly, Defendants structured the lending operation such that upstream investors—like the Hudson Cove Entity Defendants—would be supposedly insulated from liability.

142.    To that end, in many instances, the Hudson Cove Entity Defendants' investment passed through the F3EA Entities and/or 777 Partners and ultimately flowed to ZocaLoans' operating accounts maintained at banks in Missouri and Minnesota. In several instances, Defendants investment flowed straight to ZocaLoans' operating accounts.

143.    On information and belief, the Hudson Cove Entity Defendants have invested $100 million in the ZocaLoans lending operation. This investment was used to fund loans made by ZocaLoans (usually made to consumers via ACH), and to finance the marketing, collection, and servicing of the illegal loans.

144.    On March 14, 2018, the Hudson Cove Entity Defendants invested in ZocaLoans via a $17,259,364.00 wire from an account owned by Hudson Cove Capital Management, LLC to one owned by F3EA Capital, LLC. Once the monies were received by F3EA Capital, Wander and Pasko—after consultation with, input from, and agreement by the Hudson Cove Entity Defendants—transferred the investment to one of 777 Partners' bank accounts and then onto to ZocaLoans' main operating account located at a bank in Missouri. From there, the money was wired to ZocaLoans' accounts in Minnesota, from where consumers accounts were funded via ACH.

145.    The Hudson Cove Entity Defendants initiated similar wires representing their investment in ZocaLoans and/or the reinvestment of monies received as a result of funding the illegal loans in the first instance, including, but not limited to:

    a.    $4,925,000 on December 31, 2019;

    b.  $9,850,000 on October 16, 2020;

    c.  $1,034,250 on January 4, 2021; and

    d.  $472,800 on January 6, 2022.

146.    Similar wires were initiated by the Hudson Cove Entity Defendants from 2018 through at least mid-2023, and, on information and belief, continue to this day.

147.    On information and belief, the F3EA Capital accounts that received the Hudson Cove Entity Defendants' wires were opened to facilitate Defendants' investment in ZocaLoans, and to shield Defendants' identities.

148.    The return on the Hudson Cove Entity Defendants' illegal investment was delivered to them via wires to accounts owned by Hudson Cove. Such wires include, but are not limited to:

    a.  $1,873,336 on March 15, 2019;

    b.  $1,841,415.56 on May 16, 2019;

    c.  $1,662,799.77 on February 18, 2020;

    d.  $1,287,602.86 on February 28, 2020;

    e.  $1,564,224.62 on March 16, 2020;

    f.  $10,050,251.21 on August 4, 2020;

    g.  $454,810.50 on February 1, 2021;

    h.  $975,239.43 on August 17, 2021;

    i.  $612,187.84 on August 24, 2021;

    j.  $837,264.64 on September 3, 2021;

    k.  $1,000,000 on November 18, 2021;

    l.  $7,733,939.02 on January 5, 2022;

    m.  $500,000 on November 18, 2022;

n.  $1,000,000 on December 23, 2022;

o.  $2,000,000 on January 31, 2023; and

p.  $2,000,000 on February 1, 2023.

149. In exchange for their investment in ZocaLoans, the Hudson Cove Entity Defendants, Wander and Pasko received monies comprised of interest and principal payments made by Plaintiffs and other consumers on loans nominally made by ZocaLoans. The Hudson Cove Entity Defendants' investment is memorialized in loan agreements and protected by security agreements, pledge agreements, and deposit account control agreements. For example, Hudson Cove (through an administrative agent) perfected its security interests in 777 Partners (UCC financing statement initially filed March 13, 2018). Hudson Cove also maintains security interests in certain affiliates of 777 Partners who are involved in servicing, marketing, and collecting loans made by ZocaLoans, including F3EA Servicing, LLC, F3EA Capital, LLC, F3EA Holdings, LLC, and F3EA Funding, LLC.

150. Hudson Cove also has a security interest in SuttonPark Capital LLC—a company owned by Wander and Pasko—as well as Triplet Global LLC, a 777 Partners entity which owns a Bombardier Global 6000 aircraft that Wander and Pasko use to fly around the world.

151. Further, Pasko and Wander gave a holding company owned by the Hudson Cove Entity Defendants a 7.88073% membership interest in 777 Partners, LLC.

152. At all times relevant hereto, Wu and Wang oversaw all aspects of the firm's investment and operating activities, including its investment activities with ZocaLoans, 777 Partners, and the F3EA Entities.

153. On information and belief, the Hudson Cove Entity Defendants approved the Master Servicing Agreements, and all other contracts entered into by 777 Partners and the F3EA

36

Entities related to ZocaLoans as well as the documents establishing the structure and operations of the usurious lending scheme in the first instance. The Hudson Cove Entity Defendants also participated in extensive ongoing monitoring and rigorous oversight of their investment.

154.     Upon information and belief, the Hudson Cove Entity Defendants' management (including Wu and Wang) decided to invest in ZocaLoans, knowing that those funds would be used to support its usurious lending activities and knowingly maintained their investment despite their knowledge that it aided, abetted, and supported the usurious lending scheme.

155.     Upon information and belief, Wu and Wang participated in Hudson Cove's decision to invest in ZocaLoans, knowing that those funds would be used to support its usurious lending activities. Further, Wu and Wang knowingly maintained the Hudson Cove Entity Defendants' investment despite their knowledge that it aided, abetted, and supported the usurious lending scheme.

156.     Similarly, with full knowledge that it would be used to facilitate the high-interest loans, Wander and Pasko invested millions of dollars of their own money in ZocaLoans to be used in connection with the usurious lending scheme. In exchange, on information and belief, Wander and Pasko received a fixed return of 21% APR on the invested funds, as well as a fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers.

157.     Upon information and belief, the Hudson Cove Entity Defendants created a shell company called Newport Funding to facilitate, from time to time, their investment and reinvestment in ZocaLoans.

158.     As a result of their investment and ownership interest in ZocaLoans, the Hudson Cove Entity Defendants received quarterly update related to portfolios, such as information

regarding performance of the portfolios, their operations, and regulatory actions and litigation against other comparable enterprises engaged in tribal lending.

159.    At all times relevant hereto, the Hudson Cove Entity Defendants, Wander, and Pasko had knowledge of the usurious lending scheme and knowingly maintained their interest and involvement.

**F.    Plaintiffs' Experiences.**

160.    The interest rates charged on Plaintiffs' loans were more than 40 to 75 times the amount permitted by state usury and licensing laws.

161.    For example, in January 2020, Plaintiff Al-Nahhas obtained a $350 loan from ZocaLoans with an annual percentage rate of 534.75%. Plaintiff Al-Nahhas paid the loan in full, including interest.

162.    In March 2021, ZocaLoans made another $350 loan to Plaintiff Al-Nahhas with an APR of 693.10%. This loan was paid off, including interest.

163.    In May 2021, Plaintiff Al-Nahhas obtained a $750 loan from ZocaLoans with an annual percentage rate of 691.35%. This loan was paid off, including interest.

164.    In September 2021, Plaintiff Al-Nahhas obtained an installment loan from ZocaLoans with an amount financed of $900 and an annual percentage rate of 585.21%. This loan is outstanding and has not been paid in full.

165.    The loans were obtained for personal purposes and not for business purposes.

166.    Defendants have attempted to collect these loans as recently as February of 2022.

167.    All of the loans made to Plaintiff Al-Nahhas loans are void, illegal, and unenforceable under Illinois law. Plaintiff Al-Nahhas' last payment was made in early 2022.

168.    Similarly, Plaintiff Keeten received multiple loans between October 2019 and March 2021. Each of these loans had APRs over 500%, and all are void, illegal, and unenforceable under California law.

169.    The loans were obtained for personal purposes and not for business purposes.

170.    Plaintiff Keeten made payments on these loans, including interest payments. Plaintiff Keeten resided in California at all relevant times.

171.    Defendants have attempted to collect the illegal loans from Plaintiff Keeten as recently as December 5, 2024.

172.    In November 2019, ZocaLoans made a loan to Plaintiff Buckley at an interest rate exceeding 500%. Plaintiff Buckley made payments on the loan, including interest payments.

173.    In November 2021, ZocaLoans made a loan to Plaintiff Buckley at an interest rate exceeding 500%. Plaintiff Buckley made payments on the loan, including interest payments.

174.    Both loans were obtained for personal purposes and not for business purposes. None of the loans made to Plaintiff Buckley exceed $1,500.

175.    As recently as September 2024, Defendants have attempted to collect the loans made to Plaintiff Buckley.

176.    Plaintiffs all applied for their loans on the internet while located in their respective home states. No plaintiff traveled to any lands owned by the Tribe to obtain their loans.

177.    Plaintiffs each used their respective addresses when they applied for the loans, and they used their bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits to pay down the loans.

178.    Neither Defendants nor Rosebud Lending LZO or ZocaLoans were licensed by the relevant authorities in Illinois, California, or Kansas—or any other state—to make consumer loans.

179. Because of the failure to comply with each Plaintiffs' respective state's usury and/or licensing requirements, Plaintiffs' loans are void and no principal, interest, fees, or other charges are recoverable in connection with the loans.

180. Similarly, almost all other states treat as illegal unlicensed small loans like those involved here.[16]

181. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans

---

[16] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); Kan. Stat. § 16a-5-201; La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9¬A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53¬166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3¬201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

at issue in this case, which have victimized hundreds of thousands of consumers on terms like Plaintiffs. Indeed, about 10,000 loans were made just to Illinois residents from January 1, 2018 to the present.

**G. Facts related to tolling of the statute of limitations period.**

182. Tolling doctrines, including equitable tolling and fraudulent concealment, apply to RICO claims. *Rotella v. Wood*, 528 U.S. 549, 560-561 (2000).

183. "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 908 (7th Cir. 2016) (quoting *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016).

184. To satisfy the second prong, the circumstances causing the litigant's delay must be "both extraordinary and beyond its control." *Menominee Indian Tribe*, 577 U.S. at 257.

185. Based on these standards, the Court should find that equity warrants tolling of any of Plaintiffs' claims—to the extent the limitations period has run on the same—until at least February 10, 2022, when similarly situated consumers first filed suit against a tribal payday lending practice in this district.[17]

186. Tolling is warranted until this time because the contracts waive the borrowers' federal and state rights.

*187.* Equitable tolling is further warranted because the "tribal law" governing the contracts prospectively waived all substantive and procedural rights of borrowers. *See*, *e.g.*, *Fahy*

---

[17] As explained below, the statute of limitations should be further tolled until April 2023 pursuant to the doctrine of fraudulent concealment.

*v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 802 (N.D. Ill. 2024); *Hengle v. Treppa*, 19 F.4th 324, 344 (4th Cir. 2021) ("[W]e conclude that a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy.").

188.    In addition, the doctrine of fraudulent concealment warrants tolling here. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997).

189.    To toll the limitations period based on fraudulent concealment, a plaintiff must show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *In re Copper Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997).

190.    Each condition is satisfied here.

191.    First, as explained above, Defendants fraudulently concealed their involvement in the lending scheme by using the Rosebud Lending LZO as a front for their illegal lending activities.

192.    In addition, document after document demonstrates that borrowers were misled into believing that they were doing business with a company owned and operated by a sovereign government. By way of example, on its homepage, the website stated that "Rosebud Lending LZO is the tribal lending agency of Rosebud Lending, a subsidiary of the Rosebud Economic Development Corporation, an economic development arm and entity of the Rosebud Sioux Tribe, a sovereign nation located within the United States of America and operating within the Tribe's reservation. Rosebud Lending does business as ZocaLoans."[18] Each of those claims is demonstrably false.

---

[18] The Wayback Machine, a digital archive containing the history of billions of websites, first captured a snapshot of the ZocaLoans website on December 16, 2017. *See* Wayback Machine, Archive of ZocaLoans, https://web.archive.org/web/20171201000000*/www.zocaloans.com.

193.    The template loan contracts made similar misrepresentations designed to fraudulently conceal the role of Defendants. The template loan contracts also waived federal and state law for the purpose of preventing borrowers from filing any claims related to the loans, which may have uncovered the role of Defendants.

194.    Second, Plaintiffs did not know, and could not discover, the facts regarding Defendants' involvement until shortly before this case was filed.

195.    Further, Plaintiffs exercised due diligence. Despite the fraudulent concealments and misrepresentations, Plaintiffs identified and sued some of the key participants in the scheme as early as February 10, 2022. This lawsuit placed Defendants on notice that, once identified, they would likely be sued for their involvement.

196.    In other words, Plaintiffs were not dilatory in their prosecution of the case against Defendants' business partners.

197.    Because the identities of the Defendants had been fraudulently concealed through the structure, misrepresentations, and restructuring of the scheme, Plaintiffs submit that the statute of limitations should be tolled until at least April 1, 2023.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

198.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

199.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(d) Class"—initially defined as:

All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi,

Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(d) Class.

200.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois § 1962(d) Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, and (3) repaid any amount on the loan.

Plaintiff Al-Nahhas is a member of the Illinois § 1962(d) Subclass.

201.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Keeten brings this action for herself and on behalf of a class—the "California § 1962(d) Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from California, and (3) repaid any amount on the loan.

Plaintiff Keeten is a member of the California § 1962(d) Subclass.

202.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Buckley brings this action for herself and on behalf of a class—the "Kentucky § 1962(d) Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Kentucky, and (3) repaid any amount on the loan.

Plaintiff Buckley is a member of the Kentucky § 1962(d) Subclass.

203.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Plaintiffs allege that the class members are so numerous that joinder is impracticable. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the

F3EA Entities, and the class members may be notified of the pendency of this action by published and/or mailed notice.

204. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision in their loan agreements and selection of tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

205. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

206. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

207. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

208. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

209. Alternatively, ZocaLoans and the F3EA Entities were enterprises as defined in 18 U.S.C. § 1961(4).

210. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

211. Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the usurious lending scheme, including by aiding, abetting, and facilitating the scheme through their funding of the loans, as well as through their oversight of the F3EA Entities. Defendants further violated RICO by including by aiding, abetting, and facilitating the scheme through their role in the creation of the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities.

212. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

213. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

214. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(b) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(b) Class.

215. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, and (3) repaid any amount on the loan.

> Plaintiff Al-Nahhas is a member of the Illinois § 1962(b) Subclass.

216. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Keeten brings this action for herself and on behalf of a class—the "California § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from California, and (3) repaid any amount on the loan.

> Plaintiff Keeten is a member of the California § 1962(b) Subclass.

217.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Buckley brings this action for herself and on behalf of a class—the "Kentucky § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Kentucky, and (3) repaid any amount on the loan.

> Plaintiff Buckley is a member of the Kentucky § 1962(d) Subclass.

218.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Plaintiffs allege that the class members are so numerous that joinder is impracticable. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the F3EA Entities, and the class members may be notified of the pendency of this action by published and/or mailed notice.

219.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision in their loan agreements and selection of tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

220. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

221. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

222. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

223. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

224. Alternatively, ZocaLoans and the F3EA Entities were enterprises as defined in 18 U.S.C. § 1961(4).

225. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South

Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

226.    As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interest in and control of the enterprise involved in the unlawful collection of debt. More specifically, Defendants engaged in the unlawful collection of debt to maintain an interest and control of the enterprises identified above.

227.    Through their status as major investors, Defendants exercised considerable control over how ZocaLoans and the F3EA Entities carried out the unlawful lending scheme as a whole. As detailed above, Defendants also reinvested the usurious proceeds back into the lending scheme, thereby increasing their involvement and the number of loans made to consumers, such as Plaintiffs.

228.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

229.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

230.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

231.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(a) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(a) Class.

232.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, and (3) repaid any amount on the loan.

Plaintiff Al-Nahhas is a member of the Illinois § 1962(a) Subclass.

233.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Keeten brings this action for herself and on behalf of a class—the "California § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from California, and (3) repaid any amount on the loan.

Plaintiff Keeten is a member of the California § 1962(a) Subclass.

234.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Buckley brings this action for herself and on behalf of a class—the "Kentucky § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Kentucky, and (3) repaid any amount on the loan.

Plaintiff Buckley is a member of the Kentucky § 1962(d) Subclass.

235. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Plaintiffs allege that the class members are so numerous that joinder is impracticable. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the F3EA Entities, and the class members may be notified of the pendency of this action by published and/or mailed notice.

236. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision in their loan agreements and selection of tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants reinvested in the enterprise; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

237. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

238. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

239.     **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

240.     As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

241.     Alternatively, ZocaLoans and the F3EA Entities were enterprises as defined in 18 U.S.C. § 1961(4).

242.     All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

243.     As alleged above, Defendants violated § 1962(a) of RICO in three separate and distinct ways—any one of which independently suffices to establish liability.

244.     First, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt and using and investing such income in the establishment and operation of the lending scheme.

245. Second, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the tribal lending scheme and reinvesting that income into the tribal lending scheme in order to increase the size of the scheme.

246. Third, Defendants violated § 1962(a) of RICO by using their income and proceeds to restructure the usurious lending scheme and through the creation of promissory notes entitling them to millions of dollars of future revenues of ZocaLoans.

247. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

248. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FOUR:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

249. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

250. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(c) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(c) Class.

251.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, and (3) repaid any amount on the loan.

> Plaintiff Al-Nahhas is a member of the Illinois § 1962(c) Subclass.

252.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Keeten brings this action for herself and on behalf of a class—the "California § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from California, and (3) repaid any amount on the loan.

> Plaintiff Keeten is a member of the California § 1962(c) Subclass.

253.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Buckley brings this action for herself and on behalf of a class—the "Kentucky § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Kentucky, and (3) repaid any amount on the loan.

> Plaintiff Buckley is a member of the Kentucky § 1962(c) Subclass.

254.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the F3EA Entities, and the class members may be notified of the pendency of this action by published and/or mailed notice.

255.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision in their loan agreements and selection of tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

256. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

257. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

258. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

259. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

260. Alternatively, ZocaLoans and the F3EA Entities were enterprises as defined in 18 U.S.C. § 1961(4).

261. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

262. As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collecting unlawful debts. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme through their ownership and control of the F3EA Entities and their affiliates, which developed the tribal lending scheme at the heart of this case. Further, Defendants conducted the affairs of the enterprise by altering the business model in response to growing legal pressures. In addition, Defendants received quarterly updates regarding the scheme and reviewed and approved key business decisions related to the F3EA Entities and their instrumental involvement in the lending scheme.

263. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) because the loans would not have been made but for Defendants' participation in the enterprise.

264.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT FIVE:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

265.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

266.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

> Plaintiffs are members of the Unjust Enrichment Class.

267.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement ZocaLoans; (2) from Illinois, and (3) repaid any amount on the loans.

> Plaintiff Al-Nahhas is a member of the Illinois Unjust Enrichment Subclass.

268.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Buckley brings this action for herself and on behalf of a class—the "Kentucky Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Kentucky, and (3) repaid any amount on the loans.

> Plaintiff Buckley is a member of the Kentucky Unjust Enrichment Subclass.

269.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the F3EA Entities, and the class members may be notified of the pendency of this action by published and/or mailed notice.

270.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision in their loan agreements and selection of tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

271.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

272. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

273. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

274. As detailed above, all loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming were and are unenforceable.

275. Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void and illegal loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

276. Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with ZocaLoans.

## COUNT SIX:
## COMMON LAW CONSPIRACY
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

277.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

278.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Common Law Conspiracy Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

> Plaintiffs are members of the Common Law Conspiracy Class.

279.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois Common Law Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Illinois, and (3) repaid any amount on the loan.

> Plaintiff Al-Nahhas is a member of the Illinois Common Law Conspiracy Subclass.

280.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Keeten brings this action for herself and on behalf of a class—the "California Common Law Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from California, and (3) repaid any amount on the loan.

> Plaintiff Keeten is a member of the California Common Law Conspiracy Subclass.

281.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Buckley brings this action for herself and on behalf of a class—the "Kentucky Common Law Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with ZocaLoans; (2) from Kentucky, and (3) repaid any amount on the loan.

> Plaintiff Buckley is a member of the Kentucky Common Law Conspiracy Subclass.

282.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the F3EA Entities and their respective banks, and the class members may be notified of the pendency of this action by published and/or mailed notice.

283.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision in their loan agreements and selection of tribal law are enforceable; (3) whether Defendants combined together or with others to accomplish an unlawful purpose; (4) whether at least one member of the conspiracy committed an unlawful act; (5) whether collection of a usurious and unenforceable loan caused injuries to Plaintiffs and the class members; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

284.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

285. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

286. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

287. As detailed above, all loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming are unenforceable.

288. As alleged above, Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and profiting from the illegal and usurious loans. Among others, these agreements include the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities through the promissory notes and related documents.

289. Plaintiffs and the class members were injured as a result of Defendants' violations because they repaid amounts arising from the unlawful conspiracy.

290. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees.

## COUNT SEVEN:
## VIOLATIONS OF THE PREDATORY LOAN PREVENTION ACT AND
## THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

291. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

292. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Al-Nahhas brings this action for himself and on behalf of a class—the "Illinois Predatory Loan Prevention Act Class"—initially defined as:

> All natural persons: (1) to whom a loan was made in the name of ZocaLoans at more than 36% interest, (2) from Illinois, and (3) on or after March 23, 2021.

> Plaintiff Al-Nahhas is a member of the Illinois Predatory Loan Prevention Act Class.

293. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiff Al-Nahhas alleges that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by ZocaLoans, 777 Partners, and the F3EA Entities, and the class members may be notified of the pendency of this action by published and/or mailed notice.

294. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate

over the questions affecting only individual class members. The principal issues include: (1) whether the loans to Illinois consumers were made at interest rates exceeding 36% on or after March 23, 2021; (2) whether Plaintiff Al-Nahhas may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff Al-Nahhas and the class members against each of the defendants.

295. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Al-Nahhas' claims are typical of the claims of each putative class member. In addition, Plaintiff Al-Nahhas is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

296. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Al-Nahhas is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiff Al-Nahhas and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Al-Nahhas nor his counsel have any interests which might cause them to not vigorously pursue this action.

297. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

298. As detailed above, all loans made to Illinois consumers on or after March 23, 2021 at an interest rate over 36% are null and void and "no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

299.    All of the loans made to Illinois consumers in the name ZocaLoans were made at an interest rate exceeding 36%.

300.    As explained above, Defendants received the proceeds, directly and indirectly, of the loans originated in the name of ZocaLoans.

301.    Defendants collected loans prohibited by the Predatory Loan Prevention Act.

302.    Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.

303.    Accordingly, on behalf of himself and the class defined above, Plaintiff Al-Nahhas seeks to recover from Defendants, jointly and severally, all amounts repaid on any loan made in the name of ZocaLoans to Illinois residents at an interest rate over 36% on or after March 23, 2021. Plaintiff Al-Nahhas and the Illinois Predatory Loan Prevention Act Class also seek all actual and punitive damages, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs and against Defendants as follows:

A.    An Order certifying the proposed Classes and Subclasses under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.    An Order declaring that Defendants committed the violations of law alleged herein;

D.    An Order enjoining Defendants from taking any action to collect the unlawful debts;

E.    An Order providing for any and all injunctive relief the Court deems appropriate;

F.     An Order awarding monetary damages including, but not limited to, any actual, statutory, compensatory, punitive, incidental, or consequential damages in an amount to be determined by the Court or jury;

G.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

H.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J.     Such further relief as the Court may deem just and proper.

Dated: January 21, 2025

*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
**WALLACE MILLER**
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com

*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs demand a trial by jury.


*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
**WALLACE MILLER**
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com

*Counsel for Plaintiffs*


Dated: January 21, 2025